

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00480-CV

_____

IN THE INTEREST OF S.O., A CHILD

On Appeal from the 360th District Court
Tarrant County, Texas
Trial Court No. 360-701090-21

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. Introduction

In this private termination case brought by Appellees V.S. (Mother) and J.S. (James) against pro se appellant M.O. (Father), Father appeals the trial court's order terminating his parental rights to his son, S.O. (Sam).[1]  In thirty enumerated issues spanning nine argument sections of his brief—sections labeled "Reproductive Coercion," "Spousal Abandonment and Falsifying a Protective Order," "Unlawful Control," "Unlawful Relocation of the Child," "Adoption Fraud," "Involuntary Servitude," "Crime Victim's Rights Act," "Ex Post Facto," and "Mother's Motives and Best Interest"—Father offers a myriad of complaints attacking the trial court's termination order.[2]

---

[1]To protect the identity of the child, we use aliases to refer to him, his parents, and others connected to this case.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]While Father has listed thirty issues in the "Issues Presented" section of his brief, he does not mention these listed issues in the "Arguments" section of his brief. Thus, in addressing his issues, we will refer to the issues that are raised in the nine argument sections of his brief.  *See In re J.R.*, No. 02-23-00071-CV, 2024 WL 191211, at *4 (Tex. App.—Fort Worth Jan. 18, 2024, pet. filed) (mem. op.) (addressing issues raised in four argument sections of appellant's brief where appellant listed thirty-five issues but did not mention the listed issues in the argument section of her brief).  To the extent that any of Father's thirty listed issues are not covered in the nine argument sections of his brief, those issues are not preserved, and we overrule them.  *See id.* ("Accordingly, we initially hold that Mother has failed to preserve all issues sans those covered in her argument section, and we overrule those unpreserved issues.").

We will hold that Father has inadequately briefed all of his issues in the first seven argument sections of his brief with the exception that he has raised a challenge to the trial court's subject matter jurisdiction. We will address that challenge, and we will also address the issues raised in the final two argument sections of Father's brief—his "Ex Post Facto" complaint and his challenge to the sufficiency of the jury's best-interest finding. We will hold that the trial court possessed subject matter jurisdiction, we will reject Father's "Ex Post Facto" complaint, and we will hold that legally and factually sufficient evidence supports the jury's best-interest finding. Accordingly, we will affirm the trial court's termination order.

## II. BACKGROUND

### A. Mother and Father's Marriage, Sam's Birth, Mother and Father's Separation and Divorce, Mother and Father's Involvement with the North Carolina Court System, and Mother and Sam's Move to Texas

Mother and Father married in January 2008. In September 2011, Sam was born in North Carolina. A month after Sam was born, Mother and Father separated.[3] According to Father, he and Mother attempted to reconcile in August 2012, but in October 2012, Mother requested and obtained an ex parte domestic violence protective order from a North Carolina court.[4]

---

[3]At trial, Father testified that he "moved out because [Mother] admitted to birth control sabotage."

[4]Father states that he also tried to obtain a domestic violence protective order against Mother around that same time but that his request was denied.

Also in October 2012, Mother filed a "Complaint for Child Custody or Visitation" in cause number 12-CVD-9661 in a district court in Guilford County, North Carolina (the North Carolina Case). Later that month, Mother and Father signed a handwritten temporary custody order (the Temporary Custody Order) in the North Carolina Case to address the temporary custody of Sam. The Temporary Custody Order established that the parties agreed: (1) to joint legal custody of Sam, (2) that Mother would be granted primary physical custody of Sam, and (3) that Father would be granted visitation with Sam as mutually agreed upon by the parties.

In April 2013, Mother filed a motion to modify the Temporary Custody Order in the North Carolina Case, which she later dismissed without prejudice. That same year, Mother filed for divorce in a different North Carolina proceeding. In January 2014, Mother told Father that she intended to move with Sam from North Carolina to Texas after her employer offered her a pay increase to take a new position in Texas.[5] In or around February 2014, Father filed a counterclaim in the North Carolina Case seeking sole physical custody of Sam. Later that month, Mother and Sam moved to Texas. In March 2014, Mother and Father were divorced.[6] In December 2014, the North Carolina Case was calendared for "the annual civil clean-

---

[5]During 2014, Father was living in Afghanistan and working as a government contractor.

[6]The divorce judgment indicated that the claims relating to child custody in the North Carolina Case remained pending.

up calendar" due to the age of the case. That same month, the court presiding over the North Carolina Case signed an "Inactive Status Order," placing the North Carolina Case on inactive status.[7]

## B. Mother's Relationship with James, Father's Visits with Sam and Monthly Support Payments Through April 2017, Sam's Visit with Father in April 2017, and Father's April 2017 Email to Mother

In 2015, Mother started a relationship with James. James and Sam developed a good relationship and bonded, and Sam began to refer to James as "Dad." Mother and James married in September 2017.

Following Mother and Sam's move to Texas, Father saw Sam every six to eight months. Father also made monthly payments to Mother to help support Sam. Those payments stopped around April 2017, after Sam visited Father in North Carolina. During that visit, Mother dropped Sam off at one of her friend's houses, and Father later picked up Sam from the house.[8] Approximately thirty minutes after Mother dropped Sam off, the friend called Mother and told her that Father was back at the house with Sam. As Father explained it, Sam had an "outburst," so Father returned Sam to Mother. As Mother explained it, Father got upset after Sam started asking for James.

---

[7]That order provided that the North Carolina Case "is considered inactive and the case filed is placed among the Court's closed files." The order further provided that the North Carolina Case "may be opened by appropriate motion in the cause and notice of hearing."

[8]Sam was five years old during the April 2017 visit.

Later that month, Father sent Mother an email in which he indicated that he wanted Mother out of his life and that he was willing to not see Sam in order to sever ties with Mother. That email stated, in pertinent part,

> [James] has assumed the father role over [Sam] against my wishes. You are also cohabit[at]ing with him and you have publicly announced your engagement. I no longer have any legal obligation to pay child support, in fact I have been paying without order or agreement, and will not continue to do so. . . .
>
> This is not a legal acquiescence to you removing me from [Sam's] life. Planning a pregnancy without my consent, getting me to love the child, and then breaking my relationship with him is the worst thing anybody has ever done to me. . . . I consider it worse than rape, and women don't have to deal with their rapist if a child came out of the crime. Honestly . . . I just want you out of my life so I can start my new one, and I'm tired of thinking about what you've done every time I want to talk to him because I have to go through you to do it. I want you out of my life so badly that I am willing to give up seeing our son to do it, and [Sam] repeatedly saying that he wanted [James] to be his Dad in the middle of an ice cream shop was all the excuse I needed.
>
> And at this point I'm not sure it[']s healthy to keep changing around the male figure in [Sam's] life or what effect it will have on him. I am not a fan of the two dad . . . scenario. So you win for now, and [James] is going to be his Dad.
>
> In the mean[]time, I hope to not have contact with you for several years and have moved well past the damage you've done to me. Please don't make any attempt to get my address or new cell phone number. I do not wish to be contacted on either method. . . . If [Sam] is gravely ill you can contact me via my voip number and leave a message, email or Red Cross message. When he is old enough, you will provide [Sam] the allowed contact information and he can contact me on his own, if that[']s what he wants, and I will prepare for that occasion.
>
> This letter isn't designed to hurt you. . . . I never had a shot at keeping a fatherly role after you moved [Sam] to Texas, and you can't

keep living in denial about it just so we can continuously inject ourselves
into each other's lives.

## C.  Mother and James's Termination Suit, the Trial Court's Initial Termination Order, and the Trial Court's Order Vacating the Initial Termination Order

In June 2021, Mother and James filed their petition seeking the termination of Father's parental rights to Sam based on the predicate termination grounds set forth in Subsections (C) and (F) of Section 161.001(b)(1) of the Family Code (the Texas Case). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C), (F). Father answered the petition, and the case proceeded to a bench trial in November 2022. In February 2023, the trial court signed a termination order (the Initial Termination Order) finding that Father had engaged in conduct under Subsections (C) and (F) and that termination of his parental rights was in Sam's best interest.

In March 2023, Father filed a motion to vacate the Initial Termination Order. In that motion, Father argued, among other things, that the trial court lacked jurisdiction over the termination proceeding due to the North Carolina Case. Mother and James's counsel later wrote a letter to the trial court requesting that it grant Father's motion to vacate the Initial Termination Order "for the limited purpose of providing more time for the Court to obtain answers to [certain jurisdictional questions] and for the Court to communicate with the North Carolina court under Texas Family Code sections 152.110, 152.206, 152.207(a), and NC General Statutes section 50A-207(a)." *See* Tex. Fam. Code Ann. §§ 152.110, .206, .207(a); N.C. Gen. Stat. Ann. § 50A-207(a). In April 2023, the trial court signed an order vacating the

7

Initial Termination Order "pending further consideration of the North Carolina procedures and consultation with the North Carolina Court."[9] *See* Tex. Fam. Code Ann. § 152.110.

**D. The Conference Between the Trial Court and the North Carolina Trial Court Regarding the Texas Case and the North Carolina Case**

In May 2023, the trial court sent to the trial court in the North Carolina Case a synopsis of its understanding of the procedural history of the North Carolina Case, along with a synopsis of the procedural history of the Texas Case. *See id.*; N.C. Gen. Stat. Ann. § 50A-110. The trial court indicated that it sought a conference with the North Carolina trial court regarding the Texas Case and the North Carolina Case. *See* Tex. Fam. Code Ann. § 152.110; N.C. Gen. Stat. Ann. § 50A-110. Later that month, the two courts conferenced.[10]

In June 2023, the trial court in the North Carolina Case signed an order detailing the course of proceedings in the North Carolina Case and the Texas Case. In that order, the North Carolina trial court stated, "This Court determines that the State of Texas is the more appropriate forum to exercise jurisdiction over the parties and the minor child subject to this action pursuant to N.C.G.S. § 50A-202 because

[9]Father also filed an appeal of the Initial Termination Order. We later dismissed that appeal as moot because of the trial court's granting of Father's motion to vacate. *See In re S.O.*, No. 02-23-00065-CV, 2023 WL 3643637, at *1 (Tex. App.—Fort Worth May 25, 2023, no pet.) (mem. op.).

[10]An order pertaining to the conference mentions that both Mother and Father were present for the conference and appeared pro se.

8

North Carolina no longer has continuing exclusive jurisdiction." *See* N.C. Gen. Stat. Ann. § 50A-202. The North Carolina trial court further determined that "the State of Texas, rather than North Carolina, is the more convenient forum to exercise jurisdiction over the parties and minor child subject to this action pursuant to N.C.G.S. § 50A-207(b)." *See id.* § 50A-207(b). Accordingly, the North Carolina court ordered, among other things, that (1) all pending litigation in the North Carolina Case was stayed; (2) Mother should promptly pursue or continue to pursue any custodial action in the Texas Case; and (3) upon the conclusion of the Texas Case, the North Carolina Case would be dismissed.

## E. The Termination Trial

After the North Carolina trial court declined jurisdiction, the Texas Case proceeded to a jury trial in October 2023. Mother, James, and Father testified at trial. We give a brief summary of their pertinent testimony below.

### 1. Mother's Testimony

Mother testified that Sam has lived with her since his birth.[11] She stated that following her and Sam's move to Texas in 2014, Father visited Sam in Texas on approximately three occasions between 2014 and 2016. She also testified about Sam's April 2017 visit to Father in North Carolina. She stated that Sam had been looking forward to seeing Father on that trip and that he was happy with having both Father

---

[11]Sam was twelve years old at the time of trial. Sam did not testify.

9

and James in his life at that time. Following that visit, however, Sam "withdrew into himself" and did not talk about Father "for a whole year." Mother testified that Father has not made any attempt to see Sam or communicate with him since April 2017.

As to child support, Mother testified that Father initially paid around $300 a month to help support Sam.[12] She stated that around the time that she and Sam moved to Texas, Father started paying around $600 a month in child support. She said that Father stopped making child support payments after the April 2017 visit, indicating that Father's last payment was in March 2017.

Mother testified that Sam calls James "Dad," that James thinks of Sam as his son, and that James and Sam have a good relationship and have bonded. She stated that James taught Sam how to ride a bicycle, that James has helped Sam with his schoolwork, and that James has provided for Sam. She also indicated that Sam wants James to be his "legal father." She testified that Sam has autism and that he has received occupational therapy, speech therapy, and behavioral therapy. She stated that Sam sees a psychologist every other week to manage his anxiety, depression, and ADHD. She testified that it was in Sam's best interest for Father's parental rights to be terminated and for James to become Sam's "legal father." She believed that there was no "emotional benefit" to having Father in Sam's life.

_____

[12]Mother stated that the payments were made without a child support order, testifying that a child support order had never been signed pertaining to Sam.

### 2. James's Testimony

James testified that he first met Sam when Sam was three years old. He stated that Sam began referring to him as "Dad" around a year after he married Mother. James testified that he wanted to become Sam's "legal father." James indicated that Father has not visited Sam or sent any support for Sam since James's marriage to Mother.

### 3. Father's Testimony

Father testified that following Mother and Sam's move to Texas in 2014, he saw Sam every six to eight months. That changed, however, following Sam's visit to North Carolina in April 2017. Father testified that he has not seen Sam since that visit, nor has he made any attempts to speak with Sam since then, stating that he "didn't want to disturb him." As to the email he sent Mother in April 2017, Father said, "I believe boys really need a strong male presence, a consistent presence. And I was willing to let [James] do that, but it's not something that I really wanted to watch."

As to child support, Father stated that he initially provided Mother $400 a month in child support, but that, after Mother asked for more money, he gave her $600 a month. Father testified that he last paid support for Sam in either 2016 or 2017, which he admitted was more than six months before the termination case was filed. Father explained that he stopped paying money to support Sam because it was his "understanding that [he] didn't legally have to." Father stated that in 2020, he

made around $65,000 or $70,000. He admitted, however, that he paid zero child support that year.

## F. The Termination Order

At the conclusion of trial, the jury returned a verdict finding that Father had engaged in conduct under Subsections (C) and (F) of Section 161.001(b)(1) of the Family Code and that termination of his parental rights was in Sam's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C), (F), (2). The trial court later signed a termination order in accordance with the jury's findings. Father filed various motions to set aside the jury's verdict, which were denied by the trial court after a hearing. Father appeals from the trial court's termination order.

## III. DISCUSSION

## A. Briefing Waiver

We begin our discussion by addressing whether Father has waived some of his issues due to inadequate briefing.[13]

---

[13]On the day this case was set for submission, Father filed a reply brief and a letter brief. Those briefs appear to raise several new issues that were not raised in Father's initial brief. We cannot consider new issues at this juncture of the appeal. *See City of El Paso v. Pickett*, 662 S.W.3d 592, 598 n.3 (Tex. App.—El Paso 2022, no pet.) ("New or additional issues raised in a reply brief are untimely and will not be considered absent express permission from the appellate court allowing the new or additional issues."); *Flack-Batie v. Cimarron*, No. 05-11-00024-CV, 2013 WL 485750, at *2 (Tex. App.—Dallas Feb. 6, 2013, no pet.) (mem. op.) ("Additional issues raised only in a reply brief or post-submission brief will not be considered because they are untimely."); *In re K.R.S.*, No. 14-07-00080-CV, 2008 WL 2520812, at *2 (Tex. App.— Houston [14th Dist.] June 24, 2008, no pet.) (mem. op.) ("Issues not raised until a reply brief are waived."). We also note that in his letter brief, Father details alleged

## 1. Applicable Law

Rule 38.1 of the Texas Rules of Appellate Procedure contains specific requirements for an appellant's brief. *See* Tex. R. App. P. 38.1. To comply with Rule 38.1, an appellant's brief must, among other things, contain a clear and concise argument for the contentions made, with appropriate citations to legal authority and to the record. Tex. R. App. P. 38.1(i); *In re A.N.G.*, 631 S.W.3d 471, 476 (Tex. App.—El Paso 2021, no pet.). Merely uttering brief, conclusory statements unsupported by citation to legal authorities does not satisfy briefing requirements. *A.N.G.*, 631 S.W.3d at 476; *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). Indeed, "[f]ailure to cite legal authority or provide substantive analysis of the legal issue presented results in waiver of the complaint." *Valadez*, 238 S.W.3d at 845.

In reviewing for briefing waiver, we are required to construe briefs liberally so as not to waive the right to appellate review. *In re I.J.K.*, No. 08-22-00055-CV, 2023 WL 3153645, at *4 (Tex. App.—El Paso Apr. 28, 2023, pet. denied) (mem. op.) (citing *Lion Copolymer Holdings, LLC v. Lion Polymers, LLC*, 614 S.W.3d 729, 732 (Tex. 2020)).

---

contact that he has recently had with Sam. But evidence of that alleged contact is not part of the appellate record; thus, we cannot consider it on appeal. *See Lyons v. Polymathic Props., Inc.*, No. 05-15-00408-CV, 2016 WL 3564210, at *2 (Tex. App.—Dallas June 29, 2016, no pet.) (mem. op.) ("[S]tatements in a brief that are unsupported by the record cannot be accepted as facts by an appellate court."); *see also In re A.H.*, No. 02-21-00402-CV, 2022 WL 1682422, at *5 (Tex. App.—Fort Worth May 26, 2022, no pet.) (mem. op.) (declining to consider documents attached to appellant's brief that were not included in the appellate record).

Similarly, we should hesitate to resolve cases on procedural defects and instead work to resolve cases on their merits. *See St. John Missionary Baptist Church v. Flakes*, 595 S.W.3d. 211, 213–14 (Tex. 2020). Even still, "[w]e are not responsible for identifying possible trial court error, searching the record for facts favorable to a party's position, or conducting legal research to support a party's contentions." *In re J.O.A.M.*, No. 01-23-00691-CV, 2024 WL 1169432, at *23 (Tex. App.—Houston [1st Dist.] Mar. 19, 2024, no pet.) (mem. op.). "Were we to engage in such activities, we would be abandoning our role as judges and taking on the role of advocate for that party." *Id.* (citing *Valadez*, 238 S.W.3d at 845).

Pro se litigants are held to the same standards as licensed attorneys and must comply with all applicable rules of procedure. *Mansfield State Bank v. Cohn*, 573 S.W.2d 181, 185 (Tex. 1978); *In re A.W.*, No. 02-21-00317-CV, 2022 WL 1496545, at *1 n.1 (Tex. App.—Fort Worth May 12, 2022, no pet.) (mem. op.).

### 2. Complaint Regarding Reproductive Coercion

In an argument section under the heading "Reproductive Coercion," Father argues, as best as we can glean, that Mother became pregnant with Sam while representing to Father that she was using oral contraceptives. According to Father, this amounted to "reproductive coercion." Father, however, does not cite any specific page in the record to support this argument,[14] nor does he explain how his

---

[14]Father's brief does not contain any record references.

14

complaint pertaining to "reproductive coercion" would necessitate a reversal of the termination order. Accordingly, we hold that Father has inadequately briefed the issues under the "Reproductive Coercion" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23 ("An appellate issue that is not supported by argument or that contains an argument without citation to the record . . . presents nothing for review."); *A.H.*, 2022 WL 1682422, at *5 (holding that mother inadequately briefed issue where she did not provide any record citations pertaining to the issue or explain how the issue she complained of caused the rendition of an improper judgment).

### 3. Complaint Regarding Spousal Abandonment and Falsifying a Protective Order

In a half-page argument section under the heading "Spousal Abandonment and Falsifying a Protective Order," Father argues, as best as we can deduce, that Mother falsified information when she made her request in 2012 for an ex parte domestic violence protective order in North Carolina. But Father fails to identify what information was supposedly falsified, fails to provide any record references in support of his argument, and fails to explain how this complaint would necessitate a reversal of the termination order. Accordingly, we hold that Father has inadequately briefed the issues under the "Spousal Abandonment and Falsifying a Protective Order" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5.

15

### 4. Complaint Regarding Unlawful Control

In an argument section under the heading "Unlawful Control," Father argues, as best as we can ascertain, that the Temporary Custody Order should not have provided for visitation as mutually agreed upon by the parties because such visitation would give unlawful control to the custodial parent. *See In re Custody of Stancil*, 179 S.E.2d 844, 849 (N.C. Ct. App. 1971) ("Usually those who are involved in a controversy over the custody of a child have been unable to come to a satisfactory mutual agreement concerning custody and visitation rights. To give the custodian of the child authority to decide when, where and under what circumstance a parent may visit his or her child could result in a complete denial of the right."). But Father once again fails to provide any record references or to provide any analysis as to how this complaint would necessitate a reversal of the termination order. Accordingly, we hold that Father has inadequately briefed the issues under the "Unlawful Control" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5.

### 5. Complaint Regarding Unlawful Relocation of the Child

In an argument section under the heading "Unlawful Relocation of the Child," Father argues, as best as we can gather, that Mother and Sam's 2014 move from North Carolina to Texas was unlawful and constituted parental kidnapping. But Father does not provide any record references to support this complaint, nor does he explain how it would necessitate a reversal of the termination order. Arguably,

16

Father's complaint under this heading does raise an issue that the trial court lacks subject matter jurisdiction due to the North Carolina Case, and we will address that complaint later in the opinion. Accordingly, we hold that Father has inadequately briefed the issues under the "Unlawful Relocation of the Child" heading of his argument section, with the exception of his complaint that the trial court lacks subject matter jurisdiction. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5.

### 6. Complaint Regarding Adoption Fraud

In a one-paragraph argument section under the heading "Adoption Fraud," Father argues, as best as we can extract, that Mother's alleged failure to mention certain aspects of the North Carolina Case in certain pleadings in the Texas Case should subject her to criminal liability under Sections 162.107 and 162.421(g) of the Texas Family Code. *See* Tex. Fam. Code Ann. §§ 162.107, 162.421(g). But Father fails to provide any record references in support of his contention that Mother made omissions in the Texas Case, and he fails to provide any analysis as to how this complaint would necessitate a reversal of the termination order. Accordingly, we hold that Father has inadequately briefed the issues under the "Adoption Fraud" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5; *see also In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *4 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.) ("Essentially, Mother leaves it up to us to brief her issue, but we have no duty to do

17

so. Thus, Mother has forfeited the issue due to inadequate briefing." (citations omitted)).

### 7. Complaint Regarding Involuntary Servitude

In an argument section under the heading "Involuntary Servitude," Father cites two North Carolina statutes concerning the crime of involuntary servitude. *See* N.C. Gen. Stat. Ann. §§ 14-43.10(3), 14-43.12. In a one-paragraph argument that follows those citations, Father argues, as best as we can cull, that he has been forced into involuntary servitude due to Mother's actions. But Father fails to provide any record references in support of his contention that he has been forced into involuntary servitude, and he fails to provide any analysis as to how this complaint would necessitate a reversal of the termination order. Accordingly, we hold that Father has inadequately briefed the issues under the "Involuntary Servitude" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5.

### 8. Complaint Regarding the Crime Victim's Rights Act

In an argument section under the heading "Crime Victim's Rights Act," Father cites a section of the Texas Constitution stating that a crime victim has "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process" and "the right to be reasonably protected from the accused throughout the criminal justice process." Tex. Const. art. I, § 30 (a)(1), (2). In a one-sentence argument that comprises Father's entire argument

18

in this section, Father states, "Father hold[s] the clause 'to be reasonably protected' to mean not terminating his parental rights when the court gave total control over visitation to his baby rapist and things didn't turn out well." Father does not cite any portion of the record in support of this argument, nor does he provide any substantive analysis or legal authority (other than the above-cited section of the Texas Constitution) to support his argument that his rights should not be terminated due to the North Carolina trial court's rulings on visitation and due to "his baby rapist." Accordingly, we hold that Father has inadequately briefed the issues under the "Crime Victim's Rights Act" heading of his argument section. *See* Tex. R. App. P. 38.1(i); *J.O.A.M.*, 2024 WL 1169432, at *23; *A.H.*, 2022 WL 1682422, at *5; *see also I.J.K.*, 2023 WL 3153645, at *4 ("And failing to cite legal authority or provide substantive analysis results in waiver.").

## B. Complaint Regarding the Trial Court's Subject Matter Jurisdiction and Father's Ex Post Facto Complaint

We now turn to Father's argument that the trial court lacks subject matter jurisdiction and to his complaint in the argument section of his brief under the heading "Ex Post Facto." Because these arguments relate to one another, we will discuss them together. As best as we can gather, the thrust of these arguments is that the trial court lacks subject matter jurisdiction due to the North Carolina Case and that the termination order violates ex post facto principles because "Father went from being subject to North Carolina termination standards to Texas termination standards

19

on June 8, 202[3]," when the North Carolina trial court signed its order declining jurisdiction.

### 1. Applicable Law

Texas has adopted the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), which is codified in Chapter 152 of the Texas Family Code. *See* Tex. Fam. Code Ann. §§ 152.001–.317. The UCCJEA encourages national uniformity in child-custody disputes and is an attempt to address the problems of competing jurisdictions entering conflicting interstate child-custody orders, forum shopping, and the drawn out and complex child-custody legal proceedings often encountered by parties where multiple states are involved. *In re J.P.*, 598 S.W.3d 789, 794–95 (Tex. App.—Fort Worth 2020, pet. denied); *In re T.B.*, 497 S.W.3d 640, 644–45 (Tex. App.—Fort Worth 2016, pet. denied). The UCCJEA limits the jurisdiction of one state to modify the child-custody orders of another state. *T.B.*, 497 S.W.3d at 645. Most states, including Texas and North Carolina, have adopted the UCCJEA in order to reduce conflicting orders regarding the custody and placement of children. *See* Tex. Fam. Code Ann. §§ 152.001–.317; N.C. Gen. Stat. Ann. §§ 50A-101–50A-349; *T.B.*, 497 S.W.3d at 645.

Whether a trial court has jurisdiction under the UCCJEA is a matter of subject matter jurisdiction. *See In re Salminen*, 492 S.W.3d 31, 38 (Tex. App.—Houston [1st Dist.] 2016, orig. proceeding); *Waltenburg v. Waltenburg*, 270 S.W.3d 308, 313 (Tex. App.—Dallas 2008, no pet.). Whether the trial court has subject matter jurisdiction is

a question of law that we review de novo. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). We determine jurisdiction under the UCCJEA based upon the circumstances as they existed on the date that suit was filed. *Waltenburg*, 270 S.W.3d at 314.

Several provisions of the UCCJEA are pertinent to our analysis, including Section 152.201 (Initial Child Custody Jurisdiction), Section 152.202 (Exclusive Continuing Jurisdiction), Section 152.203 (Jurisdiction to Modify Determination), and Section 152.206 (Simultaneous Proceedings). *See* Tex. Fam Code Ann. §§ 152.201, .202, .203, .206.

Pursuant to Section 152.201, a court of this state has jurisdiction to make an initial child custody determination only if one of four circumstances exists. *Id.* § 152.201(a); *see* N.C. Gen. Stat. Ann. § 50A-201 (similar statute). Pertinent to this case, one of those situations is if "this state is the home state of the child on the date of the commencement of the proceeding." Tex. Fam. Code Ann. § 152.201(a)(1); *see* N.C. Gen. Stat. Ann. § 50A-201(a)(1). "Home state," under Chapter 152, is defined as "the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding." Tex. Fam. Code Ann. § 152.102(7); *see* N.C. Gen. Stat. Ann. § 50a-102(7).

Pursuant to Section 152.202, except in cases of emergency under Section 152.204, a court of the state that made a child custody determination

21

consistent with Section 152.201 or 152.203 has exclusive continuing jurisdiction over the determination until either:

> (1) a court of this state determines that neither the child, nor the child and one parent, nor the child and a person acting as a parent, have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child's care, protection, training, and personal relationships; or

> (2) a court of this state or a court of another state determines that the child, the child's parents, and any person acting as a parent do not presently reside in this state.

Tex. Fam. Code Ann. § 152.202(a); *see* N.C. Gen. Stat. Ann. § 50A-202(a).

Even if the child acquires a new home state, the state that made the initial child custody determination retains exclusive continuing jurisdiction so long as the general requisites of the "substantial connection" jurisdiction provisions are met. *Cortez v. Cortez*, 639 S.W.3d 298, 307 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (op. on reh'g). "The state that made the initial child custody determination 'is the sole determinant of whether jurisdiction continues.'" *Id.* (quoting *In re Tieri*, 283 S.W.3d 889, 894 (Tex. App.—Tyler 2008, orig. proceeding)); *see In re J.P.*, 598 S.W.3d. 789, 796 (Tex. App.—Fort Worth 2020, pet. denied) ("The UCCJEA gives [the court that made an initial child custody determination] the sole power to decide whether it will *continue* to exercise that jurisdiction.").

Pursuant to Section 152.203, except in cases of emergency under Section 152.204, a Texas court can only modify orders affecting the parent–child

22

relationship from another state if a court of this state has jurisdiction to make an initial determination under Section 152.201(a)(1) or (a)(2) and

> (1) the court of the other state determines it no longer has exclusive continuing jurisdiction under Section 152.202 or that a court of this state would be a more convenient forum under Section 152.207; or

> (2) a court of this state or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.

Tex. Fam. Code Ann. § 152.203; *see* N.C. Gen. Stat. Ann. § 50A-203.

Pursuant to Section 152.206(a), except in cases of emergency under Section 152.204, a Texas court may not exercise its jurisdiction under the UCCJEA if, at the time of the proceeding's commencement, a proceeding concerning child custody has been commenced in a court of another state having jurisdiction "substantially in conformity" with the UCCJEA, unless the proceeding has been terminated or is stayed by the court of the other state because the Texas court is a more convenient forum under Section 152.207. Tex. Fam. Code Ann. § 152.206(a); *see* N.C. Gen. Stat. Ann. § 50A-206(a). If a Texas court determines that a child-custody proceeding has been commenced in a court in another state having UCCJEA jurisdiction, the Texas court "shall stay its proceeding and communicate with the court of the other state." Tex. Fam. Code Ann. § 152.206(b); *see* N.C. Gen. Stat. Ann. § 50A-206(b).

## 2. Application of the Law to the Facts

Here, when Mother, Father, and the North Carolina trial court signed the Temporary Custody Order in October 2012, North Carolina became the first state to make an initial child custody determination regarding Sam. *See* Tex. Fam. Code Ann. § 152.201(a)(1); *see* N.C. Gen. Stat. Ann. § 50A-201(a)(1); *see also* Tex. Fam. Code Ann. § 152.102(4) (defining "[c]hild custody proceeding" as "a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue"); N.C. Gen. Stat. Ann. § 50A-102(4). As such, North Carolina had exclusive continuing jurisdiction over the child custody determination regarding Sam. *See* Tex. Fam. Code Ann. § 152.202(a); *see* N.C. Gen. Stat. Ann. § 50A-202(a).

When Mother and James filed their termination petition in 2021, Texas had jurisdiction to make an initial child custody determination because Texas was Sam's home state. *See* Tex. Fam. Code Ann. § 152.201(a)(1); N.C. Gen. Stat. Ann. § 50A-201(a)(1). To that end, Sam had been living with Mother in Texas since February 2014—more than six consecutive months prior to the filing of the termination petition. *See* Tex. Fam. Code Ann. § 152.102(7); N.C. Gen. Stat. Ann. § 50A-102(7). Despite the fact that Texas had jurisdiction to make an initial child custody determination, the trial court could only modify the North Carolina custody orders pertaining to Sam if the North Carolina trial court determined, among other things, that it no longer had continuing jurisdiction under Section 152.202 or if it determined that Texas would be a more convenient forum under Section 152.207. *See*

24

Tex. Fam. Code Ann. § 152.203; N.C. Gen. Stat. Ann. § 50A-203. Similarly, due to the simultaneous North Carolina Case, the trial court could not exercise its jurisdiction under the UCCJEA until such time that the North Carolina trial court stayed or terminated the North Carolina Case or determined that Texas was a more convenient forum under Section 152.207. Tex. Fam. Code Ann. § 152.206(a); N.C. Gen. Stat. Ann. § 50A-206(a).

After the trial court entered the Initial Termination Order, it vacated the order and communicated with the North Carolina trial court regarding the respective jurisdictions of the two states under the UCCJEA. In June 2023, the North Carolina trial court signed an order in which it determined that Texas was "the more appropriate forum to exercise jurisdiction . . . because North Carolina no longer has continuing exclusive jurisdiction," and it further determined that Texas was "the more convenient forum to exercise jurisdiction." Thus, the North Carolina trial court stayed all pending litigation in the North Carolina Case and ordered Mother to pursue her custodial actions concerning Sam in the Texas Case. At that point, the trial court had the ability to exercise its UCCJEA jurisdiction regarding custodial actions pertaining to Sam. *See* Tex. Fam. Code Ann. §§ 152.203, .206(a); N.C. Gen. Stat. Ann. §§ 50A-203, -206(a). Thus, the trial court did not lack subject matter jurisdiction. Tex. Fam. Code Ann. §§ 152.203, .206(a); N.C. Gen. Stat. Ann. §§ 50A-203, -206(a);

25

*Waltenburg*, 270 S.W.3d at 314. We thus overrule Father's complaint regarding the trial court's purported lack of subject matter jurisdiction.[15]

As to Father's ex post facto complaint, he argues that the trial court did not acquire jurisdiction until June 2023, and given the specific time requirements of Subsections 161.001(b)(1)(C) and (F), he asserts that ex post facto principles[16] were violated when the jury trial commenced in October 2023. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(C) (stating that the parent–child relationship may be terminated when the court finds by clear and convincing evidence that the parent "voluntarily left the

[15]In one sentence of his brief, Father also contends that the trial court lacks personal jurisdiction over him. But Father has provided no analysis to support that contention, and we thus overrule it as inadequately briefed. *See* Tex. R. App. P. 38.1(i). Moreover, Father has not preserved his complaint regarding personal jurisdiction. *See Tipton v. State ex rel. Lottery Comm'n*, No. 03-21-00133-CV, 2022 WL 3722389, at *3 (Tex. App.—Austin Aug. 30, 2022, no pet.) (mem. op.) ("But [Appellant] did not make a special appearance as required to avoid making a general appearance and to preserve a claim of lack of personal jurisdiction."); *see also* Tex. R. Civ. P. 120a.

[16]The term "ex post facto" refers to any law that is passed after the commission of an act which retrospectively changes the consequences of the act. *Bowers v. State,* 914 S.W.2d 213, 216 (Tex. App.—El Paso 1996, pet. ref'd). A law violates ex post facto principles if it (1) makes criminal an act that was innocent when done, (2) increases the punishment for an offense after its commission, (3) deprives one of a defense available at the time of the act, or (4) alters the legal rules of evidence and receives less or different evidence to convict than the law required at the time the act was committed. *Id.* (citing *Collins v. Youngblood*, 497 U.S. 37, 42, 110 S. Ct. 2715, 2719 (1990)). Although ex post facto concerns generally arise in the criminal context, "[t]he prohibition against ex post facto laws found in the Texas Constitution applies both to civil and criminal laws." *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.—El Paso 1998, no pet.) (op. on reh'g). Indeed, the Texas Constitution "invalidates retroactive applications of laws that destroy or impair vested rights." *Id.*; *see* Tex. Const. art. I, § 16.

child alone or in the possession of another without providing adequate support of the child and remained away for a period of at least six months"); *id.* § 161.001(b)(1)(F) (stating that the parent–child relationship may be terminated when the court finds by clear and convincing evidence that the parent "failed to support the child in accordance with the parent's ability during a period of one year ending within six months of the date of the filing of the petition").

We find Father's argument unavailing. The Texas Supreme Court has stated, in the context of a case involving the termination of parental rights, that "[a] law that does not upset a person's settled expectations in reasonable reliance upon the law is not unconstitutionally retroactive." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). And, here, Father had notice—as of at least the June 2021 filing of the termination petition[17]—that Mother and James were seeking the termination of his parental rights under Subsections (C) and (F). Thus, Father cannot claim that his settled expectations were that Texas law would not apply to any custody dispute involving Sam. *See id.* Moreover, the Texas Supreme Court, in rejecting a similar argument relating to the retroactive application of Subsection 161.001(b)(1)(Q), has stated that "the purpose of the State's intervention in the parent[–]child relationship is to protect the best interests of the children, not to punish parents for their conduct" and that courts should not "ignore [Section 161.001's] remedial purpose of protecting abused

---

[17]At trial, Father testified that he had received advice from an attorney in 2014 that jurisdiction under the UCCJEA had transferred to Texas.

and neglected children." *Id.* We overrule Father's issues under the "Ex Post Facto" heading of his argument section.[18] *See id.*

## C. Complaint Regarding Best Interest

We now turn to the argument section in Father's brief under the heading "Mother's Motives and Best Interest." As best as we can deduce, Father argues in that section that the evidence is legally and factually insufficient to support the jury's best-interest finding.[19]

---

[18]To support his ex post facto argument, Father cites *Shaw.* 966 S.W.2d at 179. We find that case distinguishable. In *Shaw*, the El Paso Court of Appeals held that "by measuring the requisite statutory period of constructive abandonment from the date of September 13, 1994, nearly a year before the effective date of [Subsection (N)]," the statute was "applied retroactively in violation of [the parent's] constitutional protections." *Id.* at 182. Here, however, we are not dealing with a situation involving a recently-enacted provision of the Texas Family Code. Rather, we are dealing with the situation where Mother and Sam have been living in Texas since 2014, and Father has had knowledge since at least June 2021 that Mother and James were seeking the termination of his parental rights under Subsections (C) and (F).

[19]This section of Father's brief simply lists the factors stated in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Thus, any issues contained in that section were likely waived due to inadequate briefing. *See* Tex. R. App. P. 38.1(i). But in the "Summary of the Arguments" section of his brief, Father states that the evidence is insufficient to support the jury's best-interest finding. Thus, after liberally construing his brief, and in an abundance of caution, we will address the sufficiency of the jury's best-interest finding. *See In re H.D.D.B.*, No. 01-20-00723-CV, 2022 WL 2251655, at *4 (Tex. App.—Houston [1st Dist.] June 23, 2022, no pet.) (mem. op.) ("Given the significant deprivation of rights that results from the termination of the parent[–]child relationship . . . we construe Father's briefs liberally to reach his appellate issues on the merits, where possible.").

28

## 1. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds listed in Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest under Section 161.001(b)(2).[20] Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding—here the best-interest finding—to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *see* Tex. Fam. Code Ann. § 161.001(b)(2). We assume that the factfinder settled any evidentiary conflicts in favor of its findings if a reasonable factfinder could have done so. *J.P.B.*, 180 S.W.3d at 573. We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the findings. *Id.* That is, we consider evidence

---

[20]Father does not challenge the sufficiency of the evidence with respect to the predicate-ground findings.

favorable to the findings if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the termination of Father's parental rights is in Sam's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002).

### 2. Applicable Law

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*,

30

89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parenting abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley*, 544 S.W.2d at 371–72; *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re Z.G.*, No. 02-23-00038-CV, 2023 WL 3521848, at *4 (Tex. App.—Fort Worth May 18, 2023, pet. denied) (mem. op.); *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.).

31

### 3. Best-Interest Analysis

As to Sam's desires, Mother testified that Sam wanted James to be his "legal father." The record also reflects that Sam refers to James as "Dad" and that Sam and James have bonded. In contrast, the record reflects that Father has not seen or communicated with Sam since April 2017. The jury was entitled to find that this factor weighed in favor of terminating Father's parental rights to Sam. *See In re P.L.G.*, No. 07-18-00206-CV, 2018 WL 4101095, at *4 (Tex. App.—Amarillo Aug. 28, 2018, pet. denied) (mem. op.) (holding that this factor weighed in favor of termination where record indicated that children had bonded with foster parent and desired to stay with her).

As to the emotional and physical needs of Sam now and in the future, the record reflects that Sam has autism, anxiety, depression, and ADHD. Mother testified that Sam has received occupational therapy, speech therapy, and behavioral therapy, and she stated that he sees a psychologist every other week. The record further reflects that Sam has bonded with James and is happy living with Mother and James. In contrast, following his last visit with Father in April 2017, Sam "withdrew into himself" and did not talk about Father "for a whole year." The jury was entitled to find that this factor weighed in favor of terminating Father's parental rights to Sam. *See In re S.D.*, 980 S.W.2d 758, 764 (Tex. App.—San Antonio 1998, pet. denied) (holding that it was in children's best interests to place them "in a stable environment where they can receive proper care for their special needs").

As to the parental abilities of the individuals seeking custody, the plans for Sam, and the stability of the home or proposed placement, the record reflects that Father has not seen or communicated with Sam since April 2017. When asked about the lack of communication at trial, Father stated that it was because he "didn't want to disturb" Sam. The record also contains an email that Father sent Mother in April 2017, in which he indicated that he was willing to not see Sam in order to sever ties with Mother. The record further reflects that Father stopped providing financial support to Sam in or around April 2017, with Father stating that he stopped supporting Sam because it was his "understanding the [he] didn't legally have to." In contrast, the record reflects that Sam has bonded with James, that Sam and James have a good relationship, and that Sam is happy living with Mother and James. Moreover, James testified that he wants to be Sam's "legal father," and Mother testified that Sam desires the same. The jury was entitled to find that these factors weighed in favor of terminating Father's parental rights to Sam. *See In re C.M.T.*, No. 07-14-00300-CV, 2014 WL 7149263, at *3 (Tex. App.—Amarillo Dec. 12, 2014, no pet.) (mem. op.) (holding that factfinder could have reasonably concluded that father did not have the ability to meet his child's needs when he had not seen the child for "nearly two years" and had not maintained "any type of contact with him").

As to Father's acts or omissions that may indicate that the existing parent–child relationship is not a proper one and Father's excuses, if any, for such acts or omissions, the record reflects that Father intentionally removed himself from Sam's

33

life in April 2017. To that end, the record reflects that Father stopped visiting Sam, communicating with Sam, and providing financial support for Sam in or around April 2017. In his April 2017 email to Mother, Father indicated that he was willing to not see Sam in order to sever ties with Mother. At trial, Father stated that he stopped contacting Sam because he "didn't want to disturb him." The jury was entitled to find that these factors weighed in favor of terminating Father's parental rights to Sam. *See id.* at *3–4 (holding that evidence that father had failed to support child and constructively abandoned child supported best-interest finding).

### 4. Best-Interest Conclusion

Viewing the evidence in the light most favorable to the jury's best-interest finding, we hold that a factfinder could have reasonably formed a firm conviction or belief that termination of the parent–child relationship between Father and Sam is in Sam's best interest, and we therefore hold that the evidence is legally sufficient to support the jury's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is also factually sufficient to support the jury's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Father's issues under the "Mother's Motives and Best Interest" heading of his argument section.

## IV. CONCLUSION

Having overruled every issue raised in the nine argument sections of Father's brief, we affirm the trial court's termination order.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  May 9, 2024